## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE APPLE BRAND IPHONE SEIZED FROM PREMISES IN NORRIDGEWOCK, MAINE, CURRENTLY STORED AT THE SOMERSET COUNTY SHERIFF'S OFFICE | No. 1:24-mj-00176-JCN <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

### Filed Under Seal Pursuant to Local Rule 157.6(a)

I, Kristopher Sullivan, being duly sworn, depose and state as follows in support of a search warrant sought pursuant to Federal Rule of Criminal Procedure 41, Title 18, United States Code, Section 3103a, and Title 21, United States Code, Section 879:

### INTRODUCTION

1.      I am a Special Agent with the Drug Enforcement Administration ("DEA"), assigned to the Portland, Maine, Resident Office. I have been employed as a DEA Special Agent since 2013. As a DEA Special Agent, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law, including those involving drug trafficking and related financial crimes. In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what was later confirmed by drug analysis to be scheduled drugs, including but not limited to fentanyl/heroin, cocaine, marijuana (both dried and growing), crack cocaine, methamphetamine, and various narcotics lawfully available only by prescription. I have conducted or participated in, among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking. I have

assisted in a large number of other investigations. I have assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, and other contraband were found. Through my training and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs. I am a law enforcement officer with authority to execute arrest and search warrants under the authority of the United States.

2.      I have participated in numerous arrest and seizure warrants involving a variety of offenses, including violations pertaining to drug and financial crimes investigations. I have also drafted and executed numerous warrants for residences, cellular devices, and online accounts to search for and seize physical and digital evidence. Specific to cellular devices, based on my training and experience, I am familiar with how drug trafficking enterprises and individuals associated with them utilize cell phones in furtherance of such operations.

2.      This affidavit is submitted in support of an application for a search warrant for one black Apple brand iPhone in a clear yellow case lawfully seized from JIAMIN LIAO (the "SUBJECT PHONE"). The SUBJECT PHONE was seized by the Somerset County Sheriff's Office ("SCSO") on March 25, 2024, during the SCSO's execution of a state search warrant at 114 Upper Main Street, in Norridgewock, Maine,[1] as described in **Attachment A** of this Affidavit. A photograph of the SUBJECT PHONE taken by SCSO personnel on March 25, 2024, is reproduced below:

---

[1] Because the SUBJECT PHONE was located, identified, and seized by SCSO personnel during their execution of a lawfully issued state court search warrant, the SCSO might already have all necessary authority to forensically examine the SUBJECT PHONE. I seek this additional warrant out of an abundance of caution to be certain that such an examination will comply with the Fourth Amendment and other applicable laws.



The search warrant is sought for evidence, contraband, property, and fruits and instrumentalities of violations of Title 21, United States Code, Sections 856 & 846 (Drug-Involved Premises; Conspiracy), Title 18, United States Code, Sections 1343 & 1349 (Wire Fraud; Conspiracy), and Title 18, United States Code, Sections 1956 & 1957 (Money Laundering). The applied-for warrant would authorize the forensic examination of the SUBJECT PHONE for the purpose of identifying electronically stored data more particularly described in **Attachment B**.

  3. The facts set forth in this affidavit are based on my personal knowledge, information obtained during my participation in this investigation, information from others, including law enforcement officers, my review of documents and records related to this investigation, and information gained through my training and experience, all of which I believe to be reliable. Therefore, I submit that probable cause exists to believe that evidence, contraband, property, and fruits and instrumentalities of violations of

3

Title 21, United States Code, Sections 856 & 846 (Drug-Involved Premises; Conspiracy),

Title 18, United States Code, Sections 1343 & 1349 (Wire Fraud; Conspiracy), and Title

18, United States Code, Sections 1956 & 1957 (Money Laundering) are presently located

on the SUBJECT PHONE. My affidavit is intended to provide the facts necessary for a

determination of probable cause for the requested search warrant.

## DEFINITIONS

5.      The following definitions apply to this Affidavit and **Attachment B**:

a.   "Broadband internet access service," in relevant part is "[A] mass-
market retail service by wire or radio that provides the capability to
transmit data to and receive data from all or substantially all internet
endpoints, including any capabilities that are incidental to and enable
the operation of the communications service, but excluding dial-up
internet access service. This term also encompasses any service that the
Commission finds to be providing a functional equivalent of the service
described in the previous sentence or that is used to evade the
protections set forth in this part," *see* 47, Code of Federal
Regulations ("C.F.R.") § 8.1.

b.   "Computer," as used herein, refers to "an electronic, magnetic, optical,
electrochemical, or other high speed data processing device performing
logical or storage functions, and includes any data storage facility or
communications facility directly related to or operating in conjunction
with such device" and includes smartphones, and mobile phones,
tablets, and other devices able to access the Internet, *see* 18 U.S.C.  §
1030(e)(1).

c. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

d. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. "Digital camera" means a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

f. "Google, LLC" or "Google" is a corporation which offers various products on the internet. One of the products is an email address, which Google, LLC hosts for the user, allowing individuals to send and receive electronic messages and files. Google, LLC hosts email addresses with the domain names "gmail.com" and "hotmail.com."

g. "Google Maps," is a web mapping platform and consumer application offered by Google, providing satellite imagery, aerial photography, street maps, 360° interactive panoramic views of streets, real-time traffic conditions, and route planning for traveling by foot, car, bike, air and public transportation. Google Maps uses GPS location technology on a user's phone to determine to aid user in location navigation, storing locations in the user's profile when such navigation service is utilized.

h. "GPS" means a navigation device using the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

i. "Internet," in relevant part, "means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which comprise the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio," *see* 15 U.S.C. § 6501(6).

j. "Internet Protocol address" or "IP address," refers to a unique number used by a computer or other digital device to access the Internet. IP

addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. An ISP can lease an IP to a user at physical location, such as a residence or commercial building for a set amount of time, then reassign another IP address to that same user at a later date.

k.  "Internet Service Providers" ("ISPs"), are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

l.  "Mobile applications," are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game. "WeChat" is one such mobile application.

m.  "PDA" means personal digital assistant, a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This

8

removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

n.  "Records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.  "Wireless telephone," or mobile telephone or cellular telephone, means a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the

9

Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

6.      Based on my training, experience, and research, I know that the SUBJECT PHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, in addition to valuable evidence of drug trafficking and the underlying financing related to the same.

## GENERAL BACKGROUND ON CRIMES AND THE INTERNET

7.      I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

a.   Computers and digital technology have dramatically changed the way in which subjects commit crimes. Subjects can now assume aliases or false or stolen identities and use these credentials to obtain funds from a variety of digital mobile applications across the Internet. They can transfer funds easily and convert them to digital currency or credits on a variety of applications in a matter of minutes.

b.   Individuals engaging in criminal activity can access the Internet from a variety of computers, from desktop computers, laptop computers, and smart phones or tablets. Smartphones and tablets are often carried on an individual's person.

c.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer or in the host

10

network of an ISP or other application provider. Storing this information can be intentional (*i.e.*, by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files). Digital information can also be retained unintentionally such as the traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

d. With respect to smartphones carried on an individual's person, including iPhones, the potential exists for targets of criminal investigations to delete or remove incriminating evidence immediately prior to the seizure of such devices. Based on my training and experience, data and electronic files are capable of being destroyed by smartphone users, including users of iPhones, thereby potentially frustrating law enforcement investigations and prosecutions.

### **SPECIFICS OF SEARCH AND SEIZURE OF SMARTPHONES**

7.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

8.      Based upon my training and experience and information relayed to me by agents and others involved in the forensic examination of computers, I know that smartphones, such as the iPhone, can store a variety of applications and data within their internal memory or on online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage operators. I also know that the process of searching a smartphone involves creating an exact copy or "mirror image" of the device's operating system, all applications, and various forms of data. This mirror image is generated by forensic equipment and associated software which preserves the data without altering it. The forensic device produces a file which allows investigators to review the smartphone data in its native format and in categories based upon applications. If a search warrant is issued, the SUBJECT PHONE will be imaged using the forensic device to maintain the integrity of the device's internal data and to generate a review file that will be searchable and used to locate the evidence described in **Attachment B**.

9.      Thus, based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the SUBJECT PHONE consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

## PRESENT LOCATION OF THE SUBJECT PHONE

10.     The SUBJECT PHONE is currently in the custody of SCSO personnel at the Somerset County Sheriff's Office in Madison, Maine. In my training and experience, I know that the SUBJECT PHONE has been stored in a manner in which its contents

are, to the extent material to this investigation, in substantially the same state as they were when the SUBJECT PHONE first came into the possession of law enforcement, and that the SUBJECT PHONE is likely able to be forensically copied and reviewed in the event that the requested search warrant for its contents is issued by this Court.

## **PROBABLE CAUSE**

### A.      **Background of the Investigation**

11.      DEA, in coordination with the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI"), is investigating individuals, entities, and premises involved in a suspected large-scale coordinated series of illegal marijuana grows in the state of Maine. The drug-involved premises at issue are believed to operate in violation of 21 U.S.C. § 856(a), in addition to illegally cultivating for distribution marijuana in violation of 21 U.S.C. § 841(a)(1). Associated individuals are suspected of conducting domestic money laundering transactions in violation of 18 U.S.C. § 1956(a)(1), sourced by and through proceeds derived from the specified unlawful activity of illegal marijuana cultivation, and relatedly, conducting monetary transactions in criminally derived property in amounts greater than $10,000 in violation of 18 U.S.C. § 1957. Related violations concerning a wire fraud scheme (18 U.S.C. § 1343) used to obtain mortgage financing to purchase many of the premises used for the illegal marijuana cultivation, as well as mortgage fraud (18 U.S.C. § 1014) and bank fraud (18 U.S.C. § 1344), are also under investigation.

10.      Among the premises suspected by federal investigators of illegal marijuana activity, the investigation identified residential properties located at Madison, 571 Thurston Hill Road, and Norridgewock, 114 Upper Main Street. I have reviewed real property records concerning the acquisition and ownership of Madison, 571 Thurston

Hill Road, and Norridgewock, 114 Upper Main Street, as well at the related electrical consumption of both properties.

### 1.    Madison, 571 Thurston Hill Road, Real Estate Details

11.    The warranty deed recorded with the Somerset County Register of Deeds for Madison, 571 Thurston Hill Road, shows that on May 25, 2022, the real property at such location was granted to JIAMIN LIAO. Madison town tax records indicate that JIAMIN LIAO remains the current owner of the property.

12.    A  mortgage for the property recorded with the Somerset County Register of Deeds shows that JIAMIN LIAO financed the acquisition through a mortgage granted by Hometown Equity Mortgage, LLC, of Lake Forest, California, on May 25, 2022. According to the terms of the mortgage note, JIAMIN LIAO agreed to pay Hometown Equity Mortgage, LLC the sum of $150,001, plus interest, in full by June 1, 2052. The mortgage note shows that JIAMIN LIAO's signature was made before a Maine notary public on May 25, 2022, in Franklin County, Maine.

13.    In connection with the investigation, mortgage loan records were obtained from Hometown Equity Mortgage, LLC, concerning JIAMIN LIAO's acquisition of Madison, 571 Thurston Hill Road. Such records show that JIAMIN LIAO certified to Hometown Equity Mortgage, LLC, that the loan was sought for "business purposes" regarding Madison, 571 Thurston Hill Road.[2] In the Commercial Loan Application, JIAMIN LIAO further certified that "the property will not be used for any illegal or prohibited purpose or use."

---

[2] JIAMIN LIAO also is shown by the mortgage file documentation to have signed the Purchase and Sale Agreement, ALTA Settlement Statement, and various other property disclosures and certifications concerning her acquisition of Madison, 571 Thurston Hill Road. JIAMIN LIAO also took out a homeowners insurance policy on Madison, 571 Thurston Hill Road, in May 2022.

14.    The Hometown Equity Mortgage, LLC, mortgage loan file included TD Bank statements for a checking account held in JIAMIN LIAO's name ending in -0641. According to the March 2022 account statement, there was a beginning balance of $2,845.72, followed by three cash deposits totaling $3,470 and four electronic transfers to the account using the third-party money transfer application Zelle, totaling an additional $8,899. According to the April 2022 account statement, there was a beginning balance of $14,379.57, with an ending balance of $77,062.57. In April 2022, the account received nine deposits of between $2,000 and $7,500, totaling $32,000, as well as wire transfers in the amounts of $15,000 and $17,000.

15.    The mortgage loan records further show that the above deposits and transfers were documented as "gift letters" from "relatives" of JIAMIN LIAO, showing that the "gifts" were to be applied toward the purchase of Madison, 571 Thurston Hill Road, with no expectation of repayment.

16.    The mortgage loan records further show that JIAMIN LIAO used the funds in the TD Bank checking account ending in -0641 to make a $1,000 earnest money payment on Madison, 571 Thurston Hill Road, on about April 8, 2022, and to issue a $74,420.13 bank check on about May 25, 2022, for the purchase of the property.

    **2.    Norridgewock, 114 Upper Main Street, Real Estate Details**

17.    The warranty deed recorded with the Somerset County Register of Deeds for Norridgewock, 114 Upper Main Street, shows that on November 29, 2023, the real property at such location was granted to JIAMIN LIAO. Norridgewock town tax records have not been updated to reflect JIAMIN LIAO's current ownership of the property.

18.    In connection with the investigation, business records were obtained from the local Maine real estate agency that represented the seller concerning the sale of

Norridgewock, 114 Upper Main Street. The records of the seller's agent show that JIAMIN LIAO used the TD Bank checking account ending in -0641 to make a $1,000 earnest money payment on Norridgewock, 114 Upper Main Street, on about September 19, 2023, and provided a screen shot of the same account to provide "proof of funds" to support the purchase of the property. A copy of the "HUD-1" Settlement Statement provided by the seller's agent shows that JIAMIN LIAO purchased Norridgewock, 114 Upper Main Street, for a contract price of $150,000, absent any mortgage loan financing. JIAMIN LIAO's signature is shown on the HUD-1 Settlement Statement dated on about November 29, 2023.

### 3.    Electrical Usage

19.    The DEA issued an administrative subpoena to Central Maine Power ("CMP") seeking electrical usage data for Madison, 571 Thurston Hill Road, and Norridgewock, 114 Upper Main Street. Records provided by CMP show that JIAMIN LIAO became the holder of the account for Madison, 571 Thurston Hill Road, in May 2022, and remained so through March 2024.

20.    The following CMP usage and billing data was shown for Madison, 571 Thurston Hill Road:

| Month & Year | Power Usage (kWh) |
|---|---|
| June 2022 | 111 |
| July 2022 | 159 |
| August 2022 | 246 |
| September 2022 | 163 |
| October 2022 | 308 |
| November 2022 | 1,656 |
| December 2022 | 6,410 |
| January 2023 | 12,970 |
| February 2023 | 11,044 |
| March 2023 | 12,737 |
| April 2023 | 18,546 |
| May 2023 | 15,273 |

16

| | |
|---|---|
| June 2023 | 14,839 |
| July 2023 | 16,386 |
| August 2023 | 14,393 |
| September 2023 | 14,488 |
| October 2023 | 15,510 |
| November 2023 | 14,323 |
| December 2023 | 17,270 |
| January 2024 | 16,311 |
| February 2024 | 15,509 |
| March 2024 | 14,927 |

21.     I know from my training and experience, as well as my discussions with other knowledgeable federal law enforcement agents, that large amounts of electrical power are needed in support of indoor marijuana cultivation, due to the use of artificial lighting, heat pumps, distribution fans, air conditioners and humidifiers. The electrical consumption for Madison, 571 Thurston Hill Road, as detailed above, was consistent with large-scale illegal marijuana cultivation, particularly from December 2022 onward. For comparison, according to the Energy Information Administration, the average U.S. household consumes about 10,500 kilowatthours of electricity per year (https://www.eia.gov/energyexplained/use-of-energy/electricity-use-in-homes.php), or roughly 875 kilowatthours per month.

22.     Electricity usage records provided by CMP show that JIAMIN LIAO became the holder of the account for Norridgewock, 114 Upper Main Street, in December 2023, and remained so through March 2024. The kilowatthour usage for Norridgewock, 114 Upper Main Street, showed normal usage. This is because, as explained below, JIAMIN LIAO used the premises of Norridgewock, 114 Upper Main Street, to unlawfully store marijuana that she cultivated at Madison, 571 Thurston Hill Road.

17

### C.      The SCSO Investigation

23.      In connection with the federal investigation, I have worked in collaboration with state and local law enforcement. Through my communications with state and local law enforcement, I learned that the SCSO was investigating illegal marijuana cultivation at Madison, 571 Thurston Hill Road, and Norridgewock, 114 Upper Main Street.

24.      The SCSO secured search warrants for both Madison, 571 Thurston Hill Road, and Norridgewock, 114 Upper Main Street. The search warrants encompassed information stored in cellular telephones and computer storage devices.

25.      DEA and HSI special agents participated in the execution of the search warrant by the SCSO on March 25, 2024, in a support capacity.

### 1.      Madison search warrant execution

26.      The search warrant for Madison, 571 Thurston Hill Road, was executed first.

27.      Inside the residence there were several rooms that were currently being utilized to grow marijuana. The residence also had several security cameras installed, on both the interior and exterior. In the master bedroom of the residence were six notebooks containing handwriting in Chinese, along with a black bag in which were located several SIM cards. Mail packages addressed to JIAMIN LIAO was also found at the residence.

28.      The basement had several rooms where walls had been built and reflective material was hung to aid in the marijuana cultivation process, with one of the rooms currently being used to grow marijuana.

29.     The entire garage area was divided into three rooms, each being utilized to grow marijuana.

30.     Approximately 551 marijuana plants were growing and flowering within these structures. Also found were chemicals (including Eagle 20 EW), used rubber gloves, and a vacuum sealer box. Samples of the marijuana were field tested and tested positive as marijuana.

### 2.      Norridgewock search warrant execution

31.     The search warrant for Norridgewock, 114 Upper Main Street, was executed later in the day on March 25, 2024, following the execution of the search warrant on Madison, 571 Thurston Hill Road.

32.     Upon entering the residence, JIAMIN LIAO was located in a first-floor bedroom, and was identified by reference to her possessing a New York State driver's license.

33.     During the search of the residence, SCSO personnel located and seized approximately thirty pounds of processed marijuana from a first-floor closet in the room where JIAMIN LIAO was found. The marijuana was packaged and vacuum-sealed in bags weighing approximately one pound each. Found in the same room were scissors, bearing a green residue that smelled of marijuana, apparently used for the cutting and trimming of the plants. A digital scale was found nearby. A vacuum sealer, plastic for the vacuum sealer, and a kitchen strainer with a green residue smelling of marijuana, were all found in a bag in the same room. A sample of the packaged marijuana was field tested and tested positive as marijuana. Located and seized from the room where

JIAMIN LIAO was found were a money counting machine, along with approximately $39,625 in United States Currency.[3]

34.     Also found were Bank of America checking account statements in JIAMIN LIAO's name; TD Bank checks for the checking account ending in -0641; and JIAMIN LIAO's U.S. Lawful Permanent Resident Card and her Chinese Passport

35.     Additionally, in a silver gray notebook found in the first-floor bedroom where JIAMIN LIAO was located, SCSO personnel discovered and seized thirty-eight Lyca Mobile SIM Cards. These were taped to four pages within the notebook, as shown by the below photographs I took at the DEA Portland Maine Resident Office:



---

[3] $32,200 in cash was found in a pink handbag in the first-floor bedroom in which JIAMIN LIAO was first identified; also found in the room was a manilla envelope with $7,005 in cash; $420 was found in a small purse, along with various credit and debit cards in JIAMIN LIAO's name.



36.     Each SIM card corresponded within the notebook to a handwritten

telephone number, detailed as follows (and as shown above):

    a.  631-691-8941 (Phone number associated)
       8919601000
       237934795

    b.  646-578-7870 (Phone number associated)
       8919601000
       252390022

    c.  631-691-8930 (Phone number associated)
       8919601000
       237934696

    d.  646-571-9804 (Phone number associated)
       8919601000
       222297380

    e.  646-515-5978 (Phone number associated)
       8919601000

222297778

f.  631-691-8982 (Phone number associated)
    8919601000
    237932930

g.  646-633-1093 (Phone number associated)
    8919601000
    222292019

h.  646-204-3484 (Phone number associated)
    8919601000
    237934951

i.  646-633-1421 (Phone number associated)
    8919601000
    237933375

j.  646-203-7270 (Phone number associated)
    8919601000
    237932914

k.  646-662-4832 (Phone number associated)
    8919601000
    237934415

l.  646-203-6556 (Phone number associated)
    8919601000
    237932922

m.  646-204-8538 (Phone number associated)
    8919601000
    237934944

n.  631-691-8967 (Phone number associated)
    8919601000
    237934407

o.  631-691-8959 (Phone number associated)
    8919601000
    237934662

p.  646-204-3406 (Phone number associated)

8919601000
237934001

q.  646-203-6007 (Phone number associated)
    8919601000
    237932906

r.  646-204-7606 (Phone number associated)
    8919601000
    237934555

s.  646-387-5963 (Phone number associated)
    8919601000
    243275431

t.  631-703-7573 (Phone number associated)
    8919601000
    222292894

u.  646-541-9676 (Phone number associated)
    8919601000
    222297760

v.  631-691-8923 (Phone number associated)
    8919601000
    237934704

w.  646-209-4958 (Phone number associated)
    8919601000
    237934266

x.  646-204-7038 (Phone number associated)
    8919601000
    237934605

y.  631-703-7612 (Phone number associated)
    8919601000
    222292035

z.  347-247-1241 (Phone number associated)
    8919601000
    237935016

aa. 929-402-5669 (Phone number associated)

8919601000
252390675

bb. 929-250-4338 (Phone number associated)
8919601000
230896405

cc. 631-640-2776 (Phone number associated)
8919601000
237935511

dd. 646-239-5714 (Phone number associated)
8919601000
237932955

ee. 646-239-7968 (Phone number associated)
8919601000
237868076

ff. 646-239-9499 (Phone number associated)
8919601000
237868225

gg. 646-726-1861 (Phone number associated)
8919601000
252390634

hh. 646-906-7919 (Phone number associated)
8919601000
252390915

ii. 646-361-8237 (Phone number associated)
8919601000
243039886

jj. 929-264-8391 (Phone number associated)
8919601000
243275423

kk. 646-906-7875 (Phone number associated)
8919601000
252390964

ll. 929-391-9113 (Phone number associated)

8919601000
252390659

37.     Also found were a black and silver thumb drive,



38.     A gold DTGE9 thumb drive,



39.     A white thumb drive,



40.    And a Sangsin Brake Hi-Q thumb drive:



41.    A 2020 Toyota RAV4 was located in the driveway of Norridgewock, 114 Upper Main Street, which was registered to JIAMIN LIAO. The vehicle was searched pursuant to the state search warrant. The interior trunk area of the vehicle was found to be lined with plastic and black trash bags, in a manner suggestive of transporting marijuana.

### D.    Interview of JIAMIN LIAO

42.    JIAMIN LIAO was detained by the SCSO and removed to a SCSO patrol vehicle parked in the driveway of Norridgewock, 114 Upper Main Street, for questioning. SCSO personnel conducted a post-*Miranda* interview of JIAMIN LIAO. I have listened to the audio recording of the interview prepared by the SCSO,[4] and provide the below details of the same, in sum and substance.:

> a.    When initially questioned about growing marijuana at Madison, 571 Thurston Hill Road, JIAMIN LIAO initially indicated that she did not understand, however, then indicated that the marijuana was for herself.

---

[4] The interview was conducted in English. On the basis of the interview, it is apparent to me that JIAMIN LIAO both speaks and understands English.

b.  JIAMIN LIAO had recently purchased Norridgewock, 114 Upper Main Street, and was fixing it up to sell it.

c.  When she was in Maine, she would stay at the Norridgewock property, rather than the Madison property.

d.  JIAMIN LIAO admitted to having approximately 20 pounds of processed marijuana at Norridgewock, 114 Upper Main Street, and claimed that it was for herself. The marijuana she kept at Norridgewock, 114 Upper Main Street, was grown by her at Madison, 571 Thurston Hill Road. A friend transported the marijuana for her.

e.  JIAMIN LIAO tended and harvested the marijuana plants at Madison, 571 Thurston Hill Road, packaged the processed marijuana in one-pound bags, and stored the product at Norridgewock, 114 Upper Main Street, in her closet.

f.  JIAMIN LIAO had been engaging in the marijuana cultivation for approximately six months. She claimed not to be working with or for anyone else, however, stated that because she is busy, a friend sometimes transported the marijuana from Madison, 571 Thurston Hill Road, to Norridgewock, 114 Upper Main Street.

g.  JIAMIN LIAO acknowledged having a mortgage on Madison, 571 Thurston Hill Road. She worked part-time at a restaurant in Boston. She received money from her family to purchase both properties.

h.  JIAMIN LIAO claimed not to sell the marijuana, stating that she kept it at the house (Norridgewock, 114 Upper Main Street) because she liked the way it smelled.

     i.   JIAMIN LIAO described the marijuana plants as "like my babies,"
stating that it made her happy when the plants grew.

43.    The SCSO seized JIAMIN LIAO's iPhone, the SUBJECT PHONE, which
had been found by SCSO personnel in the bathroom of Norridgewock, 114 Upper Main
Street. JIAMIN LIAO provided the passcode to the device.

44.    The SCSO's preliminary review of JIAMIN LIAO's iPhone showed the
following, among other things:

    a.   It was noted that the unlocked screen of the device showed footage
from different surveillance cameras that were watching the residence at
Madison, 571 Thurston Hill Road.

    b.   JIAMIN LIAO had taken a still shot after SCSO personnel had entered
Madison, 571 Thurston Hill Road, and sent the photo to a contact in
her phone listed as "Jimmy."

    c.   JIAMIN LIAO had numerous images of growing marijuana plants and
packaged processed marijuana in her iPhone.

45.    JIAMIN LIAO was arrested and charged with cultivating marijuana for
more than 500 plants (Class B), and aggravated trafficking of marijuana (Class A) for
possessing more than twenty pounds of processed marijuana. She made cash bail soon
after.

*   *   *   *   *

46.    Based on the foregoing facts, there exists probable cause to believe that
evidence of violations of Title 21, United States Code, Sections 856 & 846 (Drug-
Involved Premises; Conspiracy), Title 18, United States Code, Sections 1343 & 1349

(Wire Fraud; Conspiracy), and Title 18, United States Code, Sections 1956 & 1957 (Money Laundering) is contained within the SUBJECT DEVICE.

47.     As detailed above, the SUBJECT DEVICE was recovered from an individual connected to suspected large-scale illegal marijuana grow operations in Maine. JIAMIN LIAO has a direct ownership, financing, and control interest in such illegal grow operations.

48.     I know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that extensive marijuana cultivation operations are complex and often require oversight and labor to be provided by multiple involved individuals, rather than a single grower. Therefore, JIAMIN LIAO's grow operations likely required outside coordination and communication with other participants or co-conspirators. I believe that the SUBJECT DEVICE was used to communicate with other participants or co-conspirators concerning the illegal grow operations, and that evidence of such communications exists on each device. I believe that communications from and to JIAMIN LIAO and others concerning illegal marijuana cultivation, including via text message and WeChat, will be present on the SUBJECT DEVICE.

49.     Here, in particular, SCSO personnel actually observed the SUBJECT DEVICE containing surveillance video footage of Madison, 571 Thurston Hill Road; that JIAMIN LIAO had taken a photograph of the illegal grow site in Madison, 571 Thurston Hill Road, and sent it to another individual; and that the SUBJECT DEVICE contained photographs of marijuana.

50.     I also know from my training and experience, as well as from information provided to me by other experienced federal and state drug investigators, that cellular

telephones are often used as PDAs, similar to a personal computer. Cell phones often utilize a subscription-based data plan, which enables the user to access the Internet and GPS/directional mapping functions. It is therefore likely that the SUBJECT DEVICE had Internet and GPS functionality.

51.     Given this likely Internet and GPS access, I believe that the evidence of illegal activity will further be present on the SUBJECT DEVICE. As addressed above, evidence acquired during the investigation shows banking activity at large financial institutions by JIAMIN LIAO. Illegal drug proceeds are often laundered using multiple financial institutions. Internet-based banking applications are easily downloaded to and utilized on cellular devices such as the SUBJECT DEVICE.

52.     It is also likely that geolocation data, routes, and other geographical metadata exist on the SUBJECT DEVICE, which would have been used to navigate between the rural Maine locations of Madison and Norridgewock, as well as other locations within and outside of Maine.

53.     Relatedly, JIAMIN LIAO—who apparently resides in New York—financed the Madison, 571 Thurston Hill Road, property through a loan granted by Hometown Equity Mortgage, LLC. The mortgage loan application documentation showed that JIAMIN LIAO specifically represented and agreed that "the property will not be used for any illegal or prohibited purpose or use." More generally, in my training and experience, an important consideration in the issuance of mortgage loans is whether or not the applicant will be using the collateral property for illegal activities. Accordingly, information contained within the SUBJECT DEVICE may constitute evidence of wire fraud committed in connection with the acquisition of Madison, 571 Thurston Hill Road, and other properties.

54. Finally, in my training and experience, the possession of multiple electronic devices, detailed ledgers, contacts lists, and numerous SIM cards and storage media at Norridgewock, 114 Upper Main Street, is consistent with JIAMIN LIAO's participation in illegal activity such as drug trafficking and money laundering, and strongly indicates that evidence of such crimes will be found on the SUBJECT DEVICE. Illegal narcotics distributors routinely use multiple cell phones to conduct drug-related business, with the different phones being used for different purposes connected with their drug work. Moreover, based on my training and experience, individuals involved in the illicit drug trade often use multiple SIM cards in cell phones, in order to evade investigation and disguise their activities.

## **CONCLUSION**

55. Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that evidence of such crimes, contraband, property, and fruits and instrumentalities of such offenses, more fully described in **Attachment B**, are located in the SUBJECT PHONE described in **Attachment A**. I respectfully request that this Court issue a search warrant for the SUBJECT PHONE described in **Attachment A**, authorizing the seizure and search of the items described in **Attachment B**.

56. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

57. I am aware that the review and seizure of digital evidence may undergo a lengthy review and analysis. For this reason, the "return" inventory will contain a

general description of data recovered from the SUBJECT PHONE. Unless otherwise ordered by the Court, the return will not include evidence later examined by an investigator or forensic analyst.

_____

Kristopher Sullivan
DEA Special Agent


Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: _____ May 30 2024 _____

City and state: _____ Bangor, ME _____

_____
Judge's signature

John C Nivison U.S. Magistrate Judge
Printed name and title